2016–1813

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

_____

DRAGON INTELLECTUAL PROPERTY, LLC,

Appellant,

v.

UNIFIED PATENTS, INC.,

Appellee,

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in No. IPR2014-01252.

**BRIEF FOR APPELLANT**

Lei Mei
MEI & MARK LLP
818 18th Street NW, Suite 410
Washington, DC 20006
202-256-1008

*Counsel for Appellant Dragon Intellectual Property, LLC*

July 21, 2016

# CERTIFICATE OF INTEREST

Counsel for Appellant Dragon Intellectual Property, LLC certifies the following:

1.    The full name of every party represented by me is: Dragon Intellectual Property, LLC.

2.    The name of the real party in interest represented by me is: Dragon Intellectual Property, LLC.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: None

4.    The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear for the party in this Court (other than those already listed on the docket) are: Jason S. Angell and Robert E. Freitas of Freitas Angell & Weinberg LLP.


                                          /s/ Lei Mei
Dated: July 21, 2016                      Lei Mei

# TABLE OF CONTENTS

Page

STATEMENT OF JURISDICTION..................................................................1

I.    STATEMENT OF THE ISSUE ....................................................1

II.   STATEMENT OF THE CASE AND FACTS ...............................1

    A.    Procedural Background ........................................................1

    B.    The '444 Patent ...................................................................2

    C.    Relevant Prosecution History.............................................6

    D.    Claim Construction .............................................................7

    E.    Prior Art – Ulmer ...............................................................7

    F.    IPR Proceeding....................................................................8

III.  SUMMARY OF ARGUMENT....................................................9

IV.   ARGUMENT..............................................................................12

    A.    Standard of Review ...........................................................12

    B.    The Board Failed to Address the "Solely" Limitation of the
             Claimed "Control Circuit" in Its Obviousness Analysis....................13

          1.    The Claimed "Control Circuit" Recites both the
                  "Simultaneous Recording and Playback" limitation
                  and the "Solely" Limitation .......................................13

          2.    The Board Failed to Make Any Finding Regarding the
                  "Solely" Limitation" and thus Its Obviousness
                  Analysis Had a Logical Gap ......................................15

    C.    The Board Incorrectly Applied Case Law to Erroneously
             Find Ulmer's Alleged Inherent Disclosure of the Recited
             "Control Circuit" ...............................................................17

1.      The Mere Fact that a Certain Thing May Result from a Given Set of Circumstances Is Not Sufficient to Establish Inherency ................................................................. 18

2.      Ulmer Does Not Describe Any Specific "Control Circuit" and the Board Failed to Address Dragon's Arguments Regarding Devices Taught by Ulmer that Do Not Contain the "Solely" Limitation ................................. 19

3.      The Board Misapplied the Standard Set Forth in *Par Pharmaceutical* and *Kao* ........................................................ 21

D.    Unified Failed to Carry Its Burden to Prove that All Claim Limitations Are Disclosed or Taught By Ulmer and Goldwasser ......................................................................... 24

V.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..................... 25

# TABLE OF AUTHORITIES

**Case**                                                                          **Page**

*Brand v. Miller*,
    487 F.3d 862 (Fed. Cir. 2007) ....................................................................21

*CFMT, Inc. v. Yieldup Int'l. Corp.*,
    349 F.3d 1333 (Fed. Cir. 2003) .................................................................24

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ............................................................ 1, 10-13, 16, 17, 24

*In re Pacer Tech.*,
    338 F.3d 1348 (Fed. Cir. 2003) .................................................................12

*In re Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) ....................................................... 18, 21-24

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ...................................................................................17

*Par Pharm., Inc. v. TWi Pharm., Inc.*,
    773 F.3d 1186 (Fed. Cir. 2014) .......................................... 11, 13, 18, 21-24

**Statutes and Other Authorities**

35 U.S.C. § 103……………………………………………………………1, 12, 24
35 U.S.C. § 141..……………………………………………………………….. 1
35 U.S.C. § 142..……………………………………………………………….. 1
35 U.S.C. § 316……………………………………………………………… 12
35 U.S.C. § 318..……………………………………………………………….. 1
35 U.S.C. § 319..……………………………………………………………….. 1
37 C.F.R. § 42.73 ..……………………………………………………………... 1
37 C.F.R. § 90.3 ..……………………………………………………………… 1

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **'444 PATENT** | U.S. PATENT NO. 5,930,444 |
| **IPR PETITION** | PETITION FILED IN IPR2014-01252 CHALLENGING THE '444 PATENT |
| **AIA** | AMERICA INVENTS ACT |
| **APA** | ADMINISTRATIVE PROCEDURE ACT |
| **BOARD** | PATENT TRIAL AND APPEAL BOARD |
| **DRAGON** | APPELLANT DRAGON INTELLECTUAL PROPERTY, LLC (PATENT OWNER) |
| **GOLDWASSER** | U.S. PATENT NO. 5,241,428 |
| **IPR** | *INTER PARTES* REVIEW |
| **PHOSITA** | PERSON HAVING ORDINARY SKILL IN THE ART |
| **PTO** | U.S. PATENT AND TRADEMARK OFFICE |
| **ULMER** | PCT PUB. WO 89/12896 |
| **UNIFIED** | APPELLEE UNIFIED PATENTS INC. (IPR PETITIONER) |

## STATEMENT OF RELATED CASES

Appellant Dragon Intellectual Property, LLC ("Dragon") is the appellant in *Dragon Intellectual Property, LLC v. Apple Inc.*, Case No. 16-2186, which is a "companion case" pending before this Court. In addition, Dragon plans to appeal the Final Written Decision entered June 15, 2016 and related adverse rulings in *Dish Network L.L.C. & Sirius XM Radio Inc. v. Dragon Intellectual Property, LLC*, Case Nos. IPR2015-00499, IPR2015-01735 from the Board.

The other cases known to counsel may be directly affected by this appeal are: *Dragon Intellectual Property, LLC v. AT&T Services, Inc.*, C.A. No. 13-2061-RGA; *Dragon Intellectual Property, LLC v. Charter Communications Inc.*, C.A. No. 13-2062-RGA; *Dragon Intellectual Property, LLC v. Comcast Cable Communications LLC*, C.A. No. 13-2063-RGA; *Dragon Intellectual Property, LLC v. Cox Communications Inc.*, C.A. No. 13-2064-RGA; *Dragon Intellectual Property, LLC v. DirecTV LLC*, C.A. No. 13-2065-RGA; *Dragon Intellectual Property, LLC v. DISH Network LLC*, C.A. No. 13-2066-RGA; *Dragon Intellectual Property, LLC v. Sirius XM Radio Inc.*, C.A. No. 13-2067-RGA; *Dragon Intellectual Property, LLC v. Time Warner Cable Inc.*, C.A. No. 13-2068-RGA; and *Dragon Intellectual Property, LLC v. Verizon Communications Inc.*, C.A. No. 13-2069-RGA, all before the United States District Court for the District of Delaware, which may be subsequently appealed to this Court.

## STATEMENT OF JURISDICTION

The Board issued a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 on February 25, 2016. Dragon timely noticed appeal on April 6, 2016. *See* 35 U.S.C. §§ 142, 319; 37 C.F.R. § 90.3. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## I.    STATEMENT OF THE ISSUE

Whether the Board erred in concluding that the claims at issue are unpatentable based on its finding that "Ulmer <u>inherently</u> includes the recited control circuit," when the Board failed to properly follow the framework set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) in its obviousness analysis by (1) failing to address the "solely" limitation of the claimed "control circuit" and (2) incorrectly applying case law on inherent disclosure.

## II.    STATEMENT OF THE CASE AND FACTS

### A.    Procedural Background

Unified filed a Petition requesting an *inter partes* review ("IPR") of claims 1, 2, 7, 8, 10, 13, and 14 of the '444 patent ("claims at issue"). Appx2. The Board instituted the IPR on a single proposed ground of unpatentability under pre-AIA 35 U.S.C. § 103 over Ulmer (Appx103-21) and Goldwasser (Appx122-32). It ultimately held the claims at issue unpatentable based on its finding that "Ulmer

1

<u>inherently</u> includes the recited control circuit." Appx17 (emphasis added). This appeal followed.

### B.     The '444 Patent

The '444 patent claims priority to an application filed in 1992. Appx88. It explains that prior art technologies at that time, principally videocassette recorders ("VCRs"), could not handle a temporary interruption when a user was watching a live broadcast program (e.g., when a TV viewer had to take a telephone call while watching a live program), noting VCRs' linear-access nature and their inability to record and playback simultaneously. *Id.* at 1:47–2:32. The '444 patent solved this problem: it disclosed a recording and playback device designed to record a broadcast program during an interruption, while allowing a user to immediately and seamlessly resume watching the program right from the point at which the programming was interrupted. *Id.* at 2:38-65.

Today, this feature is widely present in many consumer electronics devices such as digital video recorder ("DVR") devices. Appx1309 at ¶ 16. It is sometimes called "live pause." *Id.*

The invention of the '444 patent discloses and claims various inventive features to overcome the limitations of VCRs. For example, Figure 1, shown below, illustrates one embodiment of the invention.



*Fig. 1*

Appx89 at Fig. 1.

Rather than utilizing conventional, tape-based recording media whose access is linear (i.e., sequential) in nature, the '444 patent uses a "random access" type of memory 12 that "includes storage media having structure adapted to enable substantially immediate access to stored information at any point thereon." Appx95 at 4:1-8.

Enabled by this "random access" type of memory, the above limitation of VCRs was overcome, and the user interface for operating the TV recorder was greatly simplified with a novel "control circuit":

Basic operation of the instant invention begins with the user watching or listening to desired programming, and recorder 10 off. Then comes a temporary information [sic, interruption] such as a telephone call, whereupon the user actuates record key 18. Control

3

circuit 14 initiates storing information present on input 22 in a recording within memory unit 12. <u>Upon conclusion of the telephone call, the user actuates playback key 20, and control circuit 14 initiates sequential retrieval from memory unit 12 of the stored information from the beginning of the recording, while storage of information present at the input 22 continues substantially simultaneously.</u> The user resumes the desired programming from the point at which the interruption occurred, the desired programming information being presented to the user with a time delay effect, the time delay being the length of the interruption so that the user has missed no information as a result of the interruption.

Appx96 at 5:20-36 (emphasis added).

The above operation was referred to as "one-key seamless playback" or "one button playback" in the IPR proceeding. The claims at issue thus all require a novel "control circuit" being configured so that a "playback key is subsequently <u>and solely</u> actuated to begin time delay playback of the recording" ("the 'solely' limitation").

This "solely" limitation quintessentially summarizes the invention over VCRs. With a VCR device, to play back a live recording after a telephone interruption, a user would have to first press a rewind key to position the VCR tape to the starting point of the recording. Appx1306 at ¶ 9. This rewinding step disturbs the user's perception of the broadcast program. *Id.*; Appx96 at 1:56-63. Embodied by the "solely" limitation, the '444 patent eliminates this rewinding step and creates a "live pause" user experience. Appx1308-09.

Claim 1, reproduced below with the limitation at issue emphasized, is illustrative:

1. A recording and playback apparatus for the substantially immediate and seamless resumption of interrupted perception of broadcast program information based upon audio or video signals, or both, without missing the program information presented during the interruption, comprising:

   means for powering the apparatus;

   a keyboard having a record key and a playback key;

   a control circuit coupled responsively to said keyboard;

   a memory unit coupled responsively to said control circuit, said memory unit having a medium for storage of information, said storage medium having structure which enables substantially random access to information stored in said medium for retrieval of the stored information from said storage medium;

   at least one input, said input being connected to a user's audio/video program signal source and also being coupled to said memory unit so as to enable program information presented by the signal source to be transferred to and stored in said memory unit; and

   at least one output, said output being connected to a user's audio or video display device or both, said output further being connected to said memory unit so as to enable the transfer of program information from said memory unit to the user's display device, <u>said control circuit being configured so that substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to begin a recording by initiating storage of the broadcast program information in said memory unit, and said playback key is subsequently **and solely** actuated to begin time delay playback of the recording from the beginning thereof by initiating retrieval of the stored program information in said memory</u>

5

unit, with the interval of the time delay being the same as the time elapsed between the actuation of said record key and the subsequent actuation of said playback key.

Appx97 (emphasis added); Appx101.

## C.    Relevant Prosecution History

The '444 patent was thoroughly examined by the PTO twice—during the original prosecution from 1994 to 1999 (Appx88) and during a supplemental examination in 2013 where Dragon submitted several prior art references, including Goldwasser, for the PTO to review (Appx102). During the original prosecution, the PTO issued at least three non-final office actions before duly issuing the '444 patent. Appx211 at ¶ 6.

During the supplemental examination, the PTO concluded, based upon a detailed review of the entire original prosecution, that the '444 patent was originally allowed because of the "solely" limitation[1] of the claimed "control circuit," Appx214 at ¶ 15, explaining:

> Based upon a review of the entire prosecution history of the '444 patent (albeit with emphasis on April 1997 Interview Summary and the 1997 Remarks), the Examiner finds that Applicants' 1997 Claim Amendments (i.e. the addition of "and solely" to independent claims l3 and 25) were made to indicate the precise function of the playback key. In particular, the Examiner finds that the 1997 Claim Amendments were made to indicate that the playback key (and

---

[1] Notably, during the original prosecution, the "solely" limitation was "requested by the Examiner, so as to obviate the need for Examiner's Amendment." Appx212-13.

6

associated control circuitry) *would alone* <u>initiate the automatic indexing of the playback function so as to enhance the seamless recovery effect</u>.

Appx213 (underline added; italics in original).

Notably, the PTO found that the several prior art references at issue, including Goldwasser, alone or in combination, did not raise a substantial new question of patentability as to claims 1 and 14 of the '444 patent. Appx216-20. Specifically regarding Goldwasser, the PTO found that while it "teaches a video recording apparatus . . . for simultaneously recording and playback of video material to/from random access memory (RAM)," it fails to teach or suggest the specific "control circuit" requiring the "solely" limitation as claimed in the '444 patent. Appx218-20.

### D.    Claim Construction

Dragon agrees with the Board that "[n]o claim terms require express construction for purposes of [its Final Written] Decision." Appx6.

### E.    Prior Art – Ulmer

Similar to Goldwasser, Ulmer discloses a "[d]evice for simultaneous recording and playback of television images." Appx114. It "relates to a method and a device making it possible to record television images and reproduce them after a short delay, in order to eliminate the advertising breaks and other sequences from a television broadcast." *Id.*

7

Ulmer further describes a method that "<u>includes</u> the following five steps":

- recording a television broadcast on the recording medium;
- <u>waiting for a time T</u> that corresponds almost to the duration of all of the advertising breaks that it is wished to eliminate from the broadcast that it is desired to watch;
- starting playback of the recording medium in order to reproduce the recorded images on a television screen;
- at the beginning of each advertising break, reproducing the images by playback at accelerated speed so that the end of the advertising break can be identified;
- at the end of the advertising break, reproducing the recorded images at normal speed.

Appx115 (emphasis added). Ulmer's disclosure, however, is very thin, and does not contain any mention of a "circuit" or "key" whatsoever. Appx114-21.

## F.    IPR Proceeding

In the IPR, Unified alleged that the claims at issue are unpatentable over Ulmer and Goldwasser. Appx6. Unified, however, declined to challenge the PTO's prior determination that Goldwasser fails to teach or suggest the specific "control circuit" requiring the "solely" limitation as claimed in the '444 patent. Appx55-58; Appx256 at ¶ 42; Appx260 at ¶ 49.

Instead, Unified alleged that Ulmer discloses the "solely" limitation. It "maintains that Ulmer describes separate record and playback mechanisms that allow for simultaneous recording and playback and that, as such, Ulmer must <u>necessarily</u> have the recited control circuit." Appx17 (emphasis added); *see also* Appx55-58. The Board agreed with Unified, reasoning:

8

> Ulmer describes an electronic device and, as such, it has circuitry to control its functions. We find that Petitioner has provided sufficient evidence to show that Ulmer teaches the recited simultaneous recording and playback. Thus, we find that Ulmer *must* have a circuit to control this functionality. As we have discussed above, Ulmer must have record and playback buttons as well. Therefore, we find that Ulmer <u>inherently</u> includes the recited control circuit.

Appx17 (underline added; italics in original).

The Board, however, failed to specifically address the "solely" limitation of the claimed "control circuit." *See id*. Moreover, the Board failed to address Dragon's arguments that Ulmer does not teach using any key or any particular mechanism to playback and thus does not <u>necessarily</u> disclose the "solely" limitation because there are other configurations whereby Ulmer's device may properly function without satisfying the "solely" limitation. *See id*; Appx1293-94; Appx1317-19. For example, it is possible that Ulmer's device may initiate a playback automatically after a predetermined time T <u>without</u> any key. Appx1317-19. As another example, between "recording" and "starting playback" steps in Ulmer, a user could have pressed (i) a "timer key" to beep to remind the user to start playback and/or (ii) an "add 1 minute" or "minus 1 minute" key. Appx1293-94.

## III.    SUMMARY OF ARGUMENT

The Board erred in concluding that the claims at issue are unpatentable based on its erroneous finding of Ulmer's alleged inherent disclosure of the recited

"control circuit" because it failed to properly follow the *Graham* framework in its obviousness analysis. 383 U.S. at 17-18. Specifically, the Board (1) failed to address the "solely" limitation" of the claimed "control circuit" and (2) incorrectly applied case law on inherent disclosure.

First, the Board failed to address the "solely" limitation" of the claimed "control circuit" when it concluded that "Ulmer inherently includes the recited control circuit." Appx17. The Board's conclusion flows from this reasoning:

> [Unified] maintains that Ulmer describes separate record and playback mechanisms that allow for simultaneous recording and playback and that, as such, Ulmer must necessarily have the recited control circuit. . . . We find that [Unified] has provided sufficient evidence to show that Ulmer teaches the recited simultaneous recording and playback. Thus, we find that Ulmer *must* have a circuit to control this functionality.

Appx17 (emphasis in original).

The claims at issues, however, require both the "simultaneous recording and playback" limitation and the "solely" limitation that, as the PTO pointedly found during the supplemental examination, "indicate[s] the precise function of the playback key." Appx213 (emphasis added). The Board thus apparently missed the "solely" limitation altogether. In other words, even assuming, *arguendo*, that the Board is correct in finding that "Ulmer *must* have a circuit to control [the simultaneous recording and playback] functionality" (Appx17), it does not

10

logically follow that Ulmer inherently (i.e., necessarily) includes the recited control circuit requiring the "solely" limitation.

Therefore, the Board failed to properly determine the differences between the prior art and the claims as required by *Graham* and its Final Written Decision should be reversed for this reason alone.

Second, the Board incorrectly applied case law to erroneously find Ulmer's alleged inherent disclosure of the recited "control circuit." Appx17. As this Court held previously, "[t]he mere fact that a certain thing *may* result from a given set of circumstances is not sufficient [to establish inherency]." *Par Pharm., Inc. v. TWi Pharm., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014) (internal citation omitted).

In the IPR proceeding, other than conclusory statements, Unified presented no evidence whatsoever supporting Ulmer's alleged inherent disclosure of the "solely" limitation. *See* Appx235-98. Indeed, as Dragon explained, Ulmer does not teach using any key or any particular mechanism to playback and thus does not necessarily disclose the "solely" limitation because there are other configurations whereby Ulmer's device may properly function without satisfying the "solely" limitation. *See id*; Appx1293-94; Appx1317-19. For example, Ulmer's device may initiate a playback automatically after a predetermined time T without any key. Appx1317-19.

Therefore, the Board's conclusion that "Ulmer inherently includes the recited control circuit" is contrary to the law and facts. Accordingly, the Board failed to properly determine the scope and content of prior art as required by *Graham* and its Final Written Decision should be reversed for this additional reason.

## IV. ARGUMENT

### A. Standard of Review

This Court reviews the Board's legal conclusions without deference and its factual findings for substantial evidence. *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003). "Substantial evidence is 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." *Id*.

The petitioner in an IPR proceeding has the burden of proving unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). Under 35 pre-AIA U.S.C. § 103, a patent may not issue "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Obviousness is a question of law based on underlying factual determinations, including: (1) the scope and content of prior art; (2) the differences between the

prior art and the claims; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness. *Graham*, 383 U.S. at 17-18.

Additionally, "the use of inherency, a doctrine originally rooted in anticipation, must be carefully circumscribed in the context of obviousness." *Par Pharm.*, 773 F.3d at 1195. Specifically, this Court held:

> A party must, therefore, meet <u>a high standard</u> in order to rely on inherency to establish the existence of a claim limitation in the prior art in an obviousness analysis—the limitation at issue <u>necessarily must be present, or the natural result</u> of the combination of elements explicitly disclosed by the prior art.

*Id*. at 1195-96 (emphasis added).

Inherency "may not be established by probabilities or possibilities. The mere fact that a certain thing <u>may</u> result from a given set of circumstances is not sufficient." *Id*. at 1196 (emphasis added; internal citation omitted). In contrast, when "the claimed limitation was an 'inherent property' of a formulation that 'adds nothing of patentable consequence,' [ ] it was inherently disclosed by the prior art formulation." *Id*. (internal citation omitted).

**B.    The Board Failed to Address the "Solely" Limitation of the Claimed "Control Circuit" in Its Obviousness Analysis**

**1.    The Claimed "Control Circuit" Recites <u>both</u> the "Simultaneous Recording and Playback" limitation <u>and</u> the "Solely" Limitation**

The "control circuit" limitation, which is required by all claims at issue, recites <u>both</u> "simultaneous recording and playback" <u>and</u> the "solely" limitation:

said control circuit being configured so that <u>substantially simultaneous recording and playback</u> of program information is achieved when said record key is first actuated to begin a recording by initiating storage of the broadcast program information in said memory unit, and <u>said playback key is subsequently **and solely** actuated to begin time delay playback</u> of the recording from the beginning thereof by initiating retrieval of the stored program information in said memory unit. . .

*See, e.g.,* Appx97 at 8:52-61 (emphasis added).

The "solely" limitation cannot be ignored, as the Board has done. Indeed, it is critical here because it defines <u>the precise function</u> of the playback key not known in VCRs: as discussed above, the PTO examiner expressly explained "that the playback key (and associated control circuitry) *would alone* initiate the automatic indexing of the playback function so as to enhance the seamless recovery effect." Appx213. Thus, it cannot be disputed that the "solely" limitation further qualifies the "substantially simultaneous recording and playback" limitation. *See, e.g.,* Appx97 at 8:52-61.

During the supplemental examination, the PTO recognized that several prior art references, including Goldwasser, teach or suggest the "simultaneous recording and playback" limitation. Appx216-20. The PTO, however, found that these prior art references, alone or in combination, did not raise a substantial new question of patentability regarding claims 1 and 14 of the '444 patent because they do not disclose the "solely" limitation. *Id*. Specifically, the PTO found that while Goldwasser "teaches a video recording apparatus . . . for simultaneously recording

14

and playback of video material to/from random access memory (RAM)," it fails to teach or suggest the specific "control circuit" requiring the "solely" limitation as claimed in the '444 patent. Appx218-20 (stating that Goldwasser fails to expressly teach or suggest "a control circuit . . . being configured so that . . . said playback key is subsequently and solely actuated to begin time delay playback of the recording from the beginning thereof . . .").

Ulmer also discloses a "[d]evice for simultaneous recording and playback of television images," and "relates to a method and a device making it possible to record television images and reproduce them after a short delay, in order to eliminate the advertising breaks and other sequences from a television broadcast." Appx114. Ulmer, however, describes at most various <u>functions</u>, but no <u>specific configuration</u>, of some circuit that may be present in its device. Appx114-21.

Therefore, the critical question for the obviousness analysis was whether Ulmer discloses the "solely" limitation—that a "playback key is subsequently <u>and solely</u> actuated to begin time delay playback of the recording."

### 2. The Board Failed to Make <u>Any</u> Finding Regarding the "Solely" Limitation" and thus Its Obviousness Analysis Had a Logical Gap

Despite the "solely" limitation being an express, critical limitation of the claims at issue, the Board entirely failed to address the "solely" limitation in finding Ulmer's alleged inherent disclosure of the recited "control circuit."

15

Appx17. Therefore, the Board failed to properly conduct the obviousness analysis as required by *Graham* because it, *inter alia,* did not properly determine the differences between the prior art and the claims. 383 U.S. at 17. This renders the Board's Final Written Decision legally defective.

The Board's flawed obviousness analysis is reproduced below:

> Petitioner [Unified] maintains that Ulmer describes separate record and playback mechanisms that allow for simultaneous recording and playback and that, as such, Ulmer must necessarily have the recited control circuit. Pet. 29–31 [Appx55-57]. Patent Owner [Dragon] argues that Ulmer does not necessarily include a control circuit. PO Resp. 35–36 [Appx1288-89]. We, however, do not find this argument persuasive. Ulmer describes an electronic device and, as such, it has circuitry to control its functions. We find that Petitioner [Unified] has provided sufficient evidence to show that Ulmer teaches the recited simultaneous recording and playback. Thus, we find that Ulmer *must* have a circuit to control this functionality. As we have discussed above, Ulmer must have record and playback buttons as well. Therefore, we find that Ulmer inherently includes the recited control circuit.

Appx17 (underline added; italics in original).[2]

Because the claims at issues recite <u>both</u> the "simultaneous recording and playback" limitation <u>and</u> the "solely" limitation, the Board's obviousness analysis

_____

[2] Also in this analysis, the Board incorrectly stated that Dragon "argue[d] that Ulmer does not necessarily include a control circuit." Appx 17 (citing "PO Resp. 35-36). In the cited portion, however, Dragon argued "[n]othing about the method of Ulmer 'necessarily requires' the control circuit <u>of the '444 Patent</u>." Appx1289 (emphasis added). The Board was apparently confused between a generic "control circuit" and a specific "control circuit" as required by claim 1 of the '444 patent.

contains a logical gap regarding the "solely" limitation. In other words, even assuming, *arguendo*, that the Board were correct in finding that "Ulmer *must* have a circuit to control [the simultaneous recording and playback] functionality" (Appx17), it does not logically follow that Ulmer inherently includes the recited control circuit requiring the "solely" limitation.

Therefore, the Board failed to properly determine the differences between the prior art and the claims as required by *Graham* and thus its legal conclusion on obviousness is erroneous as a matter of law. 383 U.S. at 17.

Moreover, the Supreme Court has held that "rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness" and that "[t]o facilitate review, this analysis should be made explicit." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). As the Board failed to make any finding regarding the "solely" limitation whatsoever, its legal conclusion on obviousness "cannot be sustained by mere conclusory statements." *See id.*

### C.  The Board Incorrectly Applied Case Law to Erroneously Find Ulmer's Alleged Inherent Disclosure of the Recited "Control Circuit"

The Board did not find that Ulmer explicitly teaches or suggests any control circuit, but instead only relied on Ulmer's alleged inherent disclosure of "the

recited control circuit." Appx17. The Board, however, misapplied case law on inherent disclosure in reaching its erroneous conclusion.

**1.    The Mere Fact that a Certain Thing <u>May</u> Result from a Given Set of Circumstances Is Not Sufficient to Establish Inherency**

As this Court cautioned in *Par Pharmaceutical*, "the use of inherency, a doctrine originally rooted in anticipation, must be <u>carefully circumscribed</u> in the context of obviousness." 773 F.3d at 1195 (emphasis added). Specifically, this Court held that a party must meet "a high standard" in order to rely on inherent disclosure, proving that "the limitation at issue <u>necessarily must be present, or the natural result</u> of the combination of elements explicitly disclosed by the prior art." *Id*. at 1195-96 (emphasis added).

Indeed, inherency "may <u>not</u> be established by probabilities or possibilities." *Id*. at 1196 (emphasis added). "The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient [to establish inherency]." *Id*. at 1195 (emphasis in original). In contrast, when "the claimed limitation was an 'inherent property' of a formulation that 'adds nothing of patentable consequence,' [ ] it was inherently disclosed by the prior art formulation." *Id*. (citing *In re Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011)).

###### 2. Ulmer Does Not Describe Any Specific "Control Circuit" and the Board Failed to Address Dragon's Arguments Regarding Devices Taught by Ulmer that Do Not Contain the "Solely" Limitation

It is undisputed that Ulmer describes a <u>method</u> that "<u>includes</u> the following five steps":

> - recording a television broadcast on the recording medium;
> - <u>waiting for a time T</u> that corresponds almost to the duration of all of the advertising breaks that it is wished to eliminate from the broadcast that it is desired to watch;
> - starting playback of the recording medium in order to reproduce the recorded images on a television screen;
> - at the beginning of each advertising break, reproducing the images by playback at accelerated speed so that the end of the advertising break can be identified;
> - at the end of the advertising break, reproducing the recorded images at normal speed.

Appx115 (emphasis added). The use of the word "includes" indicates that Ulmer contemplates possible steps in addition to the above five steps. *See id*.

As a result, the critical question becomes: does Ulmer inherently disclose the "solely" limitation? Quite simply, the answer is no because Ulmer's thin disclosure does not support any inherent disclosure that the "playback key is subsequently <u>and solely</u> actuated to begin time delay playback of the recording."

In the IPR proceeding, Unified's expert, Sheila S. Hemami, Ph.D., presented <u>no</u> evidence supporting Ulmer's alleged inherent disclosure of the "solely" limitation. *See* Appx235-98. Instead, she merely made the following conclusory statement regarding the "one-button playback" feature (i.e. the "solely" limitation):

> <u>One-button playback would necessarily be supported by the control circuit</u>
>
> (70.) Ulmer provides an extensive description of the control circuit. *See e.g.*, Ex. 1002, at 4-5 [Appx117-18]. Given the discussion above (at ¶¶ 19 [Appx245-46] and 61-62 [Appx265-66]), it would be readily apparent to one of ordinary skill that one-button playback (and all other functionality) would necessarily be supported by and provided by a control circuit. In other words, a control circuit that implemented the one-button playback as well as all other functionality of the device would be necessarily present in Ulmer.

Appx269 (underline emphasis in original; bold emphasis removed).

The discussions Dr. Hemami referred to, in paragraphs 19 and 61-62 of her declaration, however, relate to a control circuit "coupled responsively to the keyboard" and thus have nothing to do with the "solely" limitation. Appx245-46; Appx265-66. Even taken at face value, these discussions merely establish that a control circuit "coupled responsively to the keyboard" is inherent in Ulmer. Appx117-18; Appx265-66. Further, contrary to "extensive description of the control circuit" as alleged by Dr. Hemami, Ulmer at 4-5 [Appx117-18] describes at most the <u>functions</u> of a control circuit, <u>with no specifics or details whatsoever for the alleged control circuit itself</u>. Nothing supports her conclusory statement that the "solely" limitation would also be necessarily present in Ulmer. *See id*.

As Dragon explained, Ulmer does not teach using any key or any particular mechanism to playback and thus does not necessarily disclose the "solely" limitation. Appx1293-94; Appx1317-19. To the contrary, Dragon provided specific

counter-examples of other configurations whereby Ulmer's device may properly function without satisfying the "solely" limitation. Appx1318-19 at ¶¶ 48-52 ("One of ordinary skill in the art in 1992 would have known that there were many options for determining the value of 'T', and after delaying for that amount of time, beginning playback."). For example, Ulmer's device may initiate a playback automatically after a predetermined time T <u>without</u> any key. *Id*. As another example, between "recording" and "starting playback" steps in Ulmer, a user could have pressed (i) a "timer key" to beep to remind the user to start playback and/or (ii) an "add 1 minute" or "minus 1 minute" key. Appx1293-94.

Despite Dragon's arguments on this point, the Board failed to make <u>any</u> specific finding regarding the "solely" limitation and declined to address it altogether. *See* Appx17. Therefore, the Board's obviousness conclusion is not supported by the facts or findings in the present case. Yet, "it is impermissible for the Board to base its factual findings on its expertise, rather than on evidence in the record." *Brand v. Miller*, 487 F.3d 862, 869 (Fed. Cir. 2007).

### 3.    The Board Misapplied the Standard Set Forth in *Par Pharmaceutical* and *Kao*

Moreover, to establish inherency, it is not sufficient to show that Ulmer <u>may</u> lead to a PHOSITA to create a device having the "solely" limitation; rather Unified must prove that the "solely" limitation is "necessarily present." *See Par Pharm.*, 773 F.3d at 1195. Without conducting a proper analysis outlined in *Par*

*Pharmaceutical* and *Kao*, however, the Board found that "Ulmer inherently includes the recited control circuit." Appx17.

The Board's unsubstantiated conclusion is contrary to the established law. For example, in *Kao*, the claim limitation at issue was "wherein the oxymorphone $C_{max}$ is at least about 50% higher when the dosage form is administered to the subject under fed versus fasted conditions." 639 F.3d at 1070. Because that limitation was an "inherent property" of oxymorphone that "adds nothing of patentable consequence," this Court found that it was inherently disclosed by the prior art formulation." *Id.*; *see also Par Pharm.*, 773 F.3d at 1195 (citing *Kao*)

In contrast, the Board here did not make any finding that the "solely" limitation is an inherent property of any "control circuit" configured for "substantially simultaneous recording and playback." *See* Appx17. To the contrary, the PTO previously allowed the '444 patent because of the "solely" limitation, despite its careful consideration—and reconsideration—of prior art that teaches "substantially simultaneous recording and playback". Appx213.

Therefore, unlike the claim limitation in *Kao* that "adds nothing of patentable consequence," here the "solely" limitation is the very reason for the allowance of the '444 patent. Appx213-14. The "solely" limitation adds "patentable consequences" here; it is <u>not</u> an inherent property of any "control

circuit" configured for "substantially simultaneous recording and playback" and thus is not inherently disclosed. *See Kao*, 639 F.3d at 1070.

The Board largely cited *Par Pharmaceutical* for support of its obviousness analysis based on inherent disclosure. Appx15; Appx17. *Par Pharmaceutical*, however, supports Dragon's position of no inherent disclosure. In that case, the claim limitation at issue required "no substantial difference" in a food effect for a nanosized megestrol formulation. 773 F.3d at 1196. There, the district court found the limitation inherently disclosed because the defendant's expert had testified that a reduction in particle size improves bioavailability, which "necessarily results in a decrease in any food effect." *Id*. This Court reversed the district court's finding, holding:

> While it *may* be true that a reduction in particle size naturally results in *some* improvement in the food effect, the district court failed to conclude that the reduction in particle size naturally results in "no substantial difference" in the food effect.

*Id*. In other words, the Court required that the <u>exact claim limitation</u> must be analyzed in order to establish inherency. *Id*.

Similarly here, the Board found that "Ulmer *must* have a circuit to control this [simultaneous recording and playback] functionality." Appx17. Even if it were true, however, it does not lead to the conclusion that the "solely" limitation is necessarily present in Ulmer. *See, e.g.,* Appx97 at 8:52-61, Appx21. While it *may* be true that a PHOSITA *might* configure Ulmer's device to embody the "solely"

23

limitation, there are other counter-examples of configurations for Ulmer's device to function without the "solely" limitation. Appx1293-94; Appx1317-19. Thus, the "solely" limitation is not necessarily present in Ulmer and cannot be inherently disclosed by Ulmer.

Therefore, the Board has misapplied the standard set forth in *Par Pharmaceutical* and *Kao* to establish inherency. Accordingly, the Board failed to properly determine the scope and content of prior art as required by *Graham* and thus its legal conclusion on obviousness is erroneous as a matter of law for this additional reason. 383 U.S. at 17.

### D.    Unified Failed to Carry Its Burden to Prove that All Claim Limitations Are Disclosed or Taught By Ulmer and Goldwasser

Because Unified failed to meet the "high standard" for proving the inherent disclosure of the "solely" limitation in Ulmer, it failed to carry its burden to prove that all claim limitations of the claims at issue are disclosed or taught by Ulmer and Goldwasser. Therefore, Unified has failed to prove that the claims at issue are obvious under 35 U.S.C. § 103 over Ulmer and Goldwasser. *CFMT, Inc. v. Yieldup Int'l. Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) (holding that "obviousness requires a suggestion of all limitations in a claim").

## V.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Dragon respectfully requests that this Court reverse the Board's Final Written Decision, find that claims 1, 2, 7, 8, 10, 13, and 14 of the '444 patent are patentable over Ulmer and Goldwasser, and grant such other and further relief as this Court deems appropriate.


Dated: July 21, 2016                    Respectfully submitted,

                                        /s/ Lei Mei
                                        Lei Mei
                                        MEI & MARK LLP
                                        818 18th Street NW, Suite 410
                                        Washington, DC 20006
                                        202-256-1008

                                        *Counsel for Appellant Dragon Intellectual Property, LLC*

# ADDENDUM

(1) Final Written Decision
(2) United States Patent No. 5,930,444

Trials@uspto.gov                                    Paper 64
571-272-7822                              Entered: February 5, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

UNIFIED PATENTS INC.,
Petitioner,

v.

DRAGON INTELLECTUAL PROPERTY, LLC,
Patent Owner.
_____

Case IPR2014-01252
Patent 5,930,444
_____

Before GREGG I. ANDERSON, STACEY G. WHITE, and J. JOHN LEE,
*Administrative Patent Judges.*

WHITE, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-01252
Patent 5,930,444

## I.  INTRODUCTION

Unified Patents Inc. ("Petitioner") filed a Petition requesting *inter partes* review of claims 1, 2, 7, 8, 10, 13, and 14 of U.S. Patent No. 5,930,444 (Ex. 1001, "the '444 patent").  Paper 1 ("Pet.").  Dragon Intellectual Property, LLC ("Patent Owner") filed a Preliminary Response. Paper 14.  As we authorized in Paper 15, Petitioner filed a Reply Brief. Papers 18, 20.  Based on our review of these submissions, we instituted *inter partes* review of claims 1, 2, 7, 8, 10, 13, and 14 of the '444 patent on the proposed ground of unpatentability under 35 U.S.C. § 103 over Goldwasser[1] and Ulmer[2].

After institution, Patent Owner filed a Patent Owner's Response (Paper 47, "PO Resp."), and Petitioner filed a Reply (Paper 51, "Reply"). An oral hearing was conducted October 13, 2015.  A transcript of the oral hearing is included in the record. Paper 57 ("Tr.").

We have jurisdiction under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1, 2, 7, 8, 10, 13, and 14.  For the reasons discussed below, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 7, 8, 10, 13, and 14 are unpatentable.

### A.  Related Proceedings

Petitioner indicates that Patent Owner has asserted the '444 patent in ten district court cases in the District of Delaware.  Pet. 4.  In addition, the '444 patent is at issue in IPR2015-00499, which is pending.  PO Resp. 1.

---

[1] U.S. Patent No. 5,241,428, filed Mar. 12, 1991, issued Aug. 31, 1993 ("Goldwasser") (Ex. 1005).

[2] PCT Pub. WO 89/12896, published Dec. 28, 1989 ("Ulmer") (Ex. 1018).

2

IPR2014-01252
Patent 5,930,444

*B. The '444 Patent (Ex. 1001)*

The '444 patent discusses disadvantages in regards to known video cassette recorders' ("VCRs") inability to record and playback simultaneously. Ex. 1001, 1:47–2:35. The '444 patent notes that a person may encounter interruptions such as telephone calls while viewing a program. *Id.* at 1:47–49. The '444 patent explains that known VCRs allow a user to record the portion of the program starting at the time of the interruption for later viewing. *Id.* at 1:50–58. Such VCRs, however, did not allow the user to watch immediately the remainder of the program from the point of the interruption to the end of the program. *Id.* at 1:50–2:14.

The '444 patent addresses these issues with an audiovisual recording and playback device that provides substantially simultaneous recording and playback, allowing user-controlled programming delay. *Id.* at Abstract. An embodiment of such a recording and playback device is depicted in Figure 3 of the '444 patent, reproduced below.



*Fig. 3*

3

IPR2014-01252
Patent 5,930,444

Figure 3 depicts recorder 10 and its components, including memory unit 12; control circuit 14; inputs 22a, 22v, and 22m; outputs 24a, 24v, and 24m; tuner 26; modulator 32; and receiver 42. *Id.* at 3:54–64, 4:35–53, 4:59–5:4, 6:7–18. An embodiment of a remote control unit for use with recorder 10 is depicted in Figure 5, reproduced below.



Figure 5 shows remote control unit 46 and its components, including keyboard 16 and transmitter 44. *Id.* at 6:7–12, 6:25–28. Transmitter 44 of remote control unit 46 and receiver 42 of recorder 10 provide communication between remote control unit 46 and recorder 10. *Id.* at 6:8–19, 6:25–28. Keyboard 16 has a number of keys, including record key 18 and playback key 20. *Id.* at 3:65–67.

A user may actuate record key 18, for example, when a telephone call interrupts a program. *Id.* at 5:20–24. In response, control circuit 14 begins storing within memory unit 12 information received via input 22. *Id.* at 5:24–25. When the interruption ends, the user may actuate playback key 20. *Id.* at 5:25–27. In response, the system retrieves and displays the recorded information, starting from the point of the interruption, while simultaneously continuing to store information from input 22. *Id.* at 5:25–36.

4

IPR2014-01252
Patent 5,930,444

*C. Illustrative Claim*

Petitioner challenges claims 1, 2, 7, 8, 10, 13, and 14 of the '444

patent. Claims 1 and 14 are independent. Claims 2, 7, 8, 10, and 13 depend,

directly or indirectly, from claim 1. Claim 1 is illustrative and is reproduced

below:

> 1.    A recording and playback apparatus for the substantially immediate and seamless resumption of interrupted perception of broadcast[3] program information based upon audio or video signals, or both, without missing the program information presented during the interruption, comprising:
>
> means for powering the apparatus;
>
> a keyboard having a record key and a playback key;
>
> a control circuit coupled responsively to said keyboard;
>
> a memory unit coupled responsively to said control circuit, said memory unit having a medium for storage of information, said storage medium having structure which enables substantially random access to information stored in said medium for retrieval of the stored information from said storage medium;
>
> at least one input, said input being connected to a user's audio/video program signal source and also being coupled to said memory unit so as to enable program information presented by the signal source to be transferred to and stored in said memory unit; and

---

[3] A Certificate of Correction was issued March 5, 2013, replacing "perception of program information" with "perception of broadcast program information." Ex. 1001, 14.

5

> at least one output, said output being connected to
> a user's audio or video display device or both,
> said output further being connected to said
> memory unit so as to enable the transfer of
> program information from said memory unit to
> the user's display device, said control circuit
> being configured so that substantially
> simultaneous recording and playback of
> program information is achieved when said
> record key is first actuated to begin a recording
> by initiating storage of the broadcast program
> information in said memory unit, and said
> playback key is subsequently and solely
> actuated to begin time delay playback of the
> recording from the beginning thereof by
> initiating retrieval of the stored program
> information in said memory unit, with the
> interval of the time delay being the same as the
> time elapsed between the actuation of said
> record key and the subsequent actuation of said
> playback key.

Ex. 1001, 8:29–64.

## II. ANALYSIS

### A. *Claim Interpretation*

Petitioner proffers constructions for a number of claim terms.

Pet. 18–24. No claim terms require express construction for purposes of this

Decision.

### B. *Obviousness of Claims 1, 2, 7, 8, 10, 13, and 14 over Ulmer and Goldwasser*

Petitioner alleges that claims 1, 2, 7, 8, 10, 13, and 14 of the '444

patent are unpatentable under 35 U.S.C. § 103 over Goldwasser and Ulmer.

Pet. 24–35, 57–59. Petitioner relies on claim charts showing how these

6

IPR2014-01252
Patent 5,930,444

references teach the claimed subject matter. *Id*. at 35–57. Petitioner further relies on a Declaration from Dr. Sheila S. Hemami. Ex. 1013.

For the reasons discussed below, we conclude that Petitioner has established by a preponderance of the evidence that claims 1, 2, 7, 8, 10, 13, and 14 would have been obvious over Goldwasser and Ulmer.

## 1. Overview of Ulmer (Ex. 1018)

Ulmer discloses a "[d]evice for simultaneous recording and playback of television images" and a method of operating such a device. Ex. 1018, 1. Ulmer's device "comprises a playback mechanism and a recording mechanism, the playback mechanism and recording mechanism being separate and independent, with the possibility of operating simultaneously." *Id.* at Abstract. Ulmer discloses that by providing a device and method for recording television images and playing them back after a short delay, its invention serves to eliminate advertising segments and other sequences from a television program. *Id.*

Ulmer teaches that its device "uses a recording medium of the direct-access memory type." *Id.* at 3. Ulmer teaches that "[t]he direct-access memory of the recording medium comprises a double-gate linear memory of semiconductor or other type, permitting simultaneous write and read access." *Id.* at 4.

Ulmer further teaches that its devices use a playback mechanism that is separate and independent of its recorder mechanism. *Id.* at 3. The playback and recorder mechanisms can operate simultaneously, and can be positioned and moved independently on the recording medium. *Id.*

In one instance, Ulmer describes a method that includes the following five steps:

7

IPR2014-01252
Patent 5,930,444

>- recording a television broadcast on the recording medium;
>
>- waiting for a time T that corresponds almost to the duration of all of the advertising breaks that it is wished to eliminate from the broadcast that it is desired to watch;
>
>- starting playback of the recording medium in order to reproduce the recorded images on a television screen;
>
>- at the beginning of each advertising break, reproducing the images by playback at accelerated speed so that the end of the advertising break can be identified;
>
>- at the end of the advertising break, reproducing the recorded images at normal speed.

*Id.* at 2.

Ulmer also discloses that:

>[In addition, i]t is pointed out that it is the television viewer himself or herself who identifies the start and end of the advertising break that he or she wishes to eliminate, and that it is he or she who controls the device of the invention, for example with a remote.

*Id.* at 1.

### 2. *Overview of Goldwasser (Ex. 1003)*

Goldwasser is a United States Patent titled "Variable-Delay Video Recorder" that issued August 31, 1993 from an application filed March 12, 1991. Ex. 1005, at [22], [45], [54]. Goldwasser describes "[a] video recorder and playback device allowing simultaneous recording and playback of program material." *Id.* at Abstract. One of the problems that Goldwasser purports to solve is the inconvenience that arises from the inability of conventional VCRs to allow a user to view material as it is being recorded. *Id.* at 1:29–42. For example, "often one will be watching a particular program when one must temporarily cease watching it, for example to take a telephone call or the like. It would obviously be convenient to be able to

8

IPR2014-01252
Patent 5,930,444

record the program from that point forward, complete the telephone call, and simply watch the remainder delayed by the length of time of the interruption." *Id.* at 1:43–49.

One embodiment disclosed by Goldwasser is a "'random access' embodiment" whereby the video signal is converted to a digital signal and recorded in random access memory, which could include magnetic or optical media or solid state memory. *Id.* at 2:16–21. This random access embodiment is depicted in Figure 3 of Goldwasser, reproduced below.



Goldwasser's Figure 3 is a schematic diagram of its random access embodiment. *Id.* at 3:49–50. The recording device depicted in Figure 3 includes signal sampling circuit 51 and analog-to-digital converter 52, which are used together to create digital samples of the video signal being record. *Id.* at 6:25–28. These samples are stored in random access memory 53. *Id.* at 6:28–29. The storage of these digitized video samples is controlled by address controller 58, which is responsive to commands from user control panel 50. *Id.* at 6:44–48. Playback can take place from any portion of the memory at any speed without impacting the recording. *Id.* at 6:38–40.

9

IPR2014-01252
Patent 5,930,444

### 3. Claims 1 and 2

Petitioner contends that claims 1 and 2 would have been obvious over Ulmer and Goldwasser. Pet. 35–51. We have reviewed Petitioner's detailed explanation identifying where each limitation allegedly would have been taught by Ulmer and Goldwasser, along with the testimony of Petitioner's declarant, Dr. Hemani. *See id.*; Ex. 1013; Reply 12–24. We also have reviewed Patent Owner's assertions and evidence as to why Petitioner's explanations and evidence are deficient. PO Resp. 17–49; Ex. 2022 (Declaration of Adam Goldberg). On this record, we are persuaded that Petitioner has shown by a preponderance of the evidence that Ulmer and Goldwasser teach each limitation of claims 1 and 2.

Petitioner asserts that Ulmer discloses a recording and playback apparatus for audio or video signals, as recited in the preamble of independent claim 1. Pet. 35–36. In addition, Petitioner notes that Goldwasser also discloses a recording and playback apparatus for audio or video signals. *Id.* at 36. Further addressing the preamble of claim 1, Petitioner asserts that "Goldwasser provides for the substantially immediate and seamless resumption of interrupted perception of program information without missing the program information presented during the interruption." *Id.* at 36–37.

Patent Owner argues that Ulmer does not disclose an "interruption" as recited in the preamble. PO Resp. 14. According to Patent Owner, Ulmer does not deal with unplanned interruptions; instead it only allows users to time shift for a planned amount of time in order to avoid commercials. *Id.* Petitioner responds by arguing that the preamble is not limiting. Reply 6.

10

IPR2014-01252
Patent 5,930,444

We need not decide whether the preamble is limiting because we find that the prior art relied upon teaches the recited interruption. Goldwasser recites:

> Similarly, often one will be watching a particular program when one must temporarily cease watching it, for example, to take a telephone call or the like. It would obviously be convenient to be able to record the program from that point forward, complete the telephone call, and simply watch the remainder delayed by length of time of the interruption.

Pet. 36–37 (citing Ex. 1003, 1:43–49). We find that this passage teaches the recited interruption.

As to the body of claim 1, Petitioner asserts that the combination of Ulmer and Goldwasser teaches a keyboard having a record and a playback key. Pet. 28 (citing Ex. 1013 ¶ 59). Petitioner argues that Ulmer necessarily teaches the recited keyboard because it has a remote control that controls the operation of Ulmer's device. *Id.* (citing Ex. 1001, 6:37–41; Ex. 1018, 1, 3; Ex. 1013 ¶ 60). According to Petitioner, "[t]he purpose of remotes at this time was to allow for the control of the device, be it a television or a VCR, using buttons and/or keys to input functions." Reply 15 (citing Ex. 1013 ¶¶ 59–60). Petitioner provides evidence that it contends shows that a person of ordinary skill in the art would have been aware of VCR remote controls with such keys. *Id.* (citing Ex. 1013 ¶¶ 25, 27–28; Ex. 1004); Tr. 10–11 (citing Ex. 1013 ¶ 28; Ex. 1004, 2; Ex. 1008, 2:29–34). For example, Exhibit 1004 is a March 1992 article that describes reviewing VCRs based on the logical arrangement of the keys on the remote control. *Id.* at 11; *see* Pet. 8. In addition, Exhibit 1008 is patent issued in 1989 that discloses a remote control with buttons for record and playback. Tr. 11; *see* Pet. 13. Petitioner also argues that the specification of the '444 patent acknowledges that VCRs operated by remote control were well-known in the art. Pet. 28

11

IPR2014-01252
Patent 5,930,444

(citing Ex. 1001, 6:37–41). Ulmer's remote control is capable of "recording a television broadcast" and "starting playback of a recording medium"; thus, Petitioner argues it necessarily has keys on its remote control corresponding to these functions. Reply 15 (citing Ex. 1018, 2). In addition to the teachings of Ulmer, Petitioner also cites Goldwasser's discussion of a user control panel by which a user can control the apparatus. Pet. 28. (citing Ex. 1013 ¶ 58). In the alternative, Petitioner argues that it would have been an obvious design choice to use a remote control with play and record buttons to control Ulmer's device. Reply 20; Tr. 10:7–14. Petitioner contends that "[a] person of ordinary skill was well aware of these features, and in designing a digital VCR, they would select these features readily and with ease to suit their design goals." Pet. 14 (citing Ex. 1013 ¶ 38).

Petitioner also asserts that Ulmer discloses a "memory unit," "at least one input," "at least one output," and "substantially simultaneous recording and playback of program information," as recited in claim 1. Pet. 29–31, 41–42, 45–47. Petitioner further asserts that a person of ordinary skill in the art would understand that Ulmer's system includes the claim 1 limitation that

> substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to begin a recording by initiating storage of the broadcast program information in said memory unit, and said playback key is subsequently and solely actuated to begin time delay playback of the recording from the beginning thereof by initiating retrieval of the stored program information in said memory unit.

*Id.* at 48–49.

Because this claim language recites "said playback key is subsequently and solely actuated to begin time delay playback," Petitioner

12

IPR2014-01252
Patent 5,930,444

describes claim 1 as requiring "'one button playback.'"  *See, e.g.*, *id.* at 1–2, 15–16, 31–32.  Petitioner asserts that a person of ordinary skill would understand that Ulmer's system includes this limitation.  *Id.* at 31–32, 48–49.

Petitioner asserts that a person of ordinary skill in the art would understand that the step of starting playback in Ulmer involves pressing the playback key only.  Pet. 32.  Petitioner explains that a person of ordinary skill in the art would understand as much because Ulmer's system allows simultaneous recording and playback, such that starting playback would not require stopping, pausing, or otherwise disturbing the pausing operation.  *Id.* (citing Ex. 1013 ¶¶ 68–69).

Relying on the testimony of Dr. Hemami, Petitioner also asserts that a person of ordinary skill in the art would understand that Ulmer's system includes a "control circuit coupled responsively to said keyboard," as recited in claim 1.  *Id.* at 29, 38–41.  Dr. Hemami explains that a person of ordinary skill in the art would understand that any remote-controlled/keyboard-controlled device needs a control circuit to execute commands entered at the keyboard.  Ex. 1013 ¶ 61; Pet. 29.  Additionally, given that Ulmer discloses control of the apparatus with the remote control, a person of ordinary skill in the art would understand that the control circuit is coupled responsively to the keyboard, Dr. Hemami explains.  Ex. 1013 ¶ 62; Pet. 29.

Petitioner further asserts that the functional diagram illustrated in Figure 3 of Goldwasser could be used to implement the details of Ulmer's apparatus and control circuit (*id.* at 25).  Petitioner explains that a person of ordinary skill in the art would be motivated to combine Goldwasser's

13

IPR2014-01252
Patent 5,930,444

disclosure with Ulmer's because of the strong similarities in the purpose and configuration of the systems. *Id.* at 25–27 (citing Ex. 1013 ¶¶ 51–52).

Patent Owner argues that the combination of Ulmer and Goldwasser does not teach the '444 patent's "a keyboard having a record key and a playback key" or the recited "control circuit." PO Resp. 19. Patent Owner also argues that there is no motivation to combine the teachings of Ulmer and Goldwasser. *Id.* at 42. We address each of Patent Owner's arguments in turn.

According to Patent Owner, Petitioner's inherency argument fails because Ulmer does not necessarily disclose the recited keyboard. Patent Owner notes that the focus of Ulmer's device is commercial skipping and not the manner in which recording or playback is achieved. *Id.* at 22. As such, it provides no specifics as to what keys may exist on its remote control. *Id.* (citing Ex. 2022 ¶¶ 34–36). Patent Owner contends that (1) Ulmer may be controlled via something other than a keypad, and (2) even if Ulmer has a keypad, that keypad may only need a key to eliminate commercials. *Id.* at 23.

As to the first argument, Patent Owner cites VCR Plus as a system known at the time of the invention that could be used to control a VCR without the use of a keyboard. Ex. 2022 ¶ 39. Using VCR Plus, a VCR could record a program by entering a code found in a television newspaper listing. *Id.* Another possibility that Patent Owner cites are VCRs that are programmed to record shows by using a bar code scanning wand. *Id.* ¶ 40. As to the second argument, Patent Owner asserts that commercials could be skipped via a "fast forward" key. *Id.* at 24 (citing Ex. 2022 ¶ 36).

14

IPR2014-01252
Patent 5,930,444

In an obviousness analysis, it is proper to use inherency to account for a claim limitation that is not expressly disclosed by the prior art. *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1194–1195 (Fed. Cir. 2014); *see also In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995) (affirming a 35 U.S.C. § 103 rejection based in part on inherent disclosure in one of the references). Our reviewing court, however, has limited the application of inherency in obviousness analysis to situations where the limitation at issue is the "natural result" of the combination of prior art elements. *Id.* at 1195. We are not persuaded by Patent Owner's arguments against inherency because they are premised upon a very limited view of Ulmer's device. Specifically, Patent Owner takes the view that Ulmer's device is only for commercial skipping and, as such, its remote control would only need to handle that one function. This is not consistent with Ulmer's specification. As described in Ulmer the "[user] controls *the device of the invention*, for example with a remote." Ex. 1018, 2 (emphasis added). This statement indicates that the remote control is used to control "the device of the invention" and not just a single function performed by the device. Ulmer's device is described expressly as having both record and playback functionality. *Id.* at Abstract, 2 (noting the separate record and playback mechanisms). Thus, Ulmer's remote control *must* be able to control both recording and playback. Therefore, we find that the use of buttons to control Ulmer's device is not based on mere probabilities or possibilities, but on the requirement that it must have such buttons to control the device. *See PAR Pharm.*, 773 F.3d at 1195 (citing *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981)). As Petitioner correctly notes, Patent Owner's proposed alternative methods for controlling Ulmer's device only provide for recording

15

IPR2014-01252
Patent 5,930,444

functionality and do not address playback. Reply 19–20. As to Patent Owner's argument that Ulmer's functionality could be achieved via a fast forward key, Ulmer describes the use of a fast forward key as a prior art mechanism, and Ulmer states that its device provides a mechanism superior to the prior art's use of fast forward to eliminate commercials. Ex. 1018, 1–2. Thus, we agree with Petitioner's arguments and find that Ulmer's device cannot be implemented by using only a fast forward key.

In addition, we also find persuasive Petitioner's argument that it would have been an obvious design choice to use play and record buttons on a remote control to control Ulmer's device. *See* Pet. 14 (citing Ex. 1013 ¶ 38). Petitioner has provided evidence that such remote controls were well known at the time of the application for the '444 patent. *See* Reply 15 (citing Ex. 1013 ¶¶ 25, 27–28; Ex. 1004); Tr. 10–11 (citing Ex. 1013 ¶ 28; Ex. 1004, 2; Ex. 1008, 2:29–34). Based on this evidence, we are persuaded it would have been within the knowledge and abilities of one of ordinary skill in the art to control Ulmer's device with a remote control that includes play and record buttons.

Patent Owner also argues that the asserted combination does not teach the recited control circuit. As recited in claim 1, the control circuit is coupled responsively to the keyboard and the memory and it is "configured so that substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to begin a recording by initiating storage of the broadcast program information in said memory unit." Ex. 1001, 8:29–64. According to Patent Owner's declarant, "Ulmer requires only that the device of Ulmer perform simultaneous recording and playback, and that it enable a user to 'eliminate' commercials

16

IPR2014-01252
Patent 5,930,444

during playback by controlling the rate of playback." Ex. 2022 ¶ 56. Mr.
Goldberg maintains that the claims of the '444 patent require more.
Specifically, he states that the claims require "that the device contain a
control circuit that achieves simultaneous recording and playback when the
user first actuates the 'record key,' and then subsequently and solely actuates
the 'playback key.'" *Id.* Petitioner maintains that Ulmer describes separate
record and playback mechanisms that allow for simultaneous recording and
playback and that, as such, Ulmer must necessarily have the recited control
circuit. Pet. 29–31. Patent Owner argues that Ulmer does not necessarily
include a control circuit. PO Resp. 35–36. We, however, do not find this
argument persuasive. Ulmer describes an electronic device and, as such, it
has circuitry to control its functions. We find that Petitioner has provided
sufficient evidence to show that Ulmer teaches the recited simultaneous
recording and playback. Thus, we find that Ulmer *must* have a circuit to
control this functionality. As we have discussed above, Ulmer must have
record and playback buttons as well. Therefore, we find that Ulmer
inherently includes the recited control circuit.

   In its Patent Owner Response, Patent Owner raised the argument that
there was no motivation to combine Ulmer and Goldwasser. PO Resp. 42–
47. At the Oral Hearing, however, Patent Owner withdrew this argument.
Tr. 32:4–11. Regardless, we find that Petitioner has provided sufficient
evidence of a motivation to combine. Petitioner explains that a person of
ordinary skill in the art would be motivated to combine Goldwasser's
disclosure with Ulmer's because both references "address the same problem:
providing simultaneous recording and playback as a mechanism to allow a
viewer to skip commercials." Pet. 25. Petitioner elaborates that due to

17

IPR2014-01252
Patent 5,930,444

extensive overlap between the systems of Ulmer and Goldwasser, a person of ordinary skill in the art would have been led to use various design details from Goldwasser's teachings in a combination of Ulmer's and Goldwasser's systems. *Id.* at 25–26

    We find that Petitioner's assertions and evidence provide rational underpinning for a conclusion that it would have been obvious to combine the teachings of Ulmer and Goldwasser. And we are persuaded Petitioner's assertions and evidence show sufficiently that the resulting system would include each of the limitations of independent claim 1 and dependent claim 2. Claim 2 depends from claim 1 and recites that the claimed apparatus "further compris[es] a remote control unit, and wherein said keyboard is housed in said remote control unit." Petitioner notes that Ulmer explicitly discloses that its system includes a remote control unit. *Id.* at 28, 37, 51. We agree with Petitioner's analysis of the recited art's disclosures as applied to claim 2. Accordingly, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence the unpatentability of independent claim 1 and dependent claim 2 over Ulmer and Goldwasser.

    *4. Claims 7, 8, and 10*

    Petitioner asserts that Ulmer's system includes the limitations of dependent claims 7, 8, and 10. Pet. 34–35, 51–56. With respect to the additional limitations of each of these claims, Petitioner asserts either that Ulmer explicitly discloses the limitation, or that a person of ordinary skill would understand that Ulmer's system includes the limitation. *Id.* Patent Owner makes no additional argument as to the patentability of these dependent claims. PO Resp. 49. We have reviewed Petitioner's argument and evidence, and we find them to be sufficient to establish the

18

IPR2014-01252
Patent 5,930,444

unpatentability of these dependent claims.  Thus, we adopt Petitioner's
analysis of these claims and find that Petitioner has demonstrated by a
preponderance of the evidence the unpatentability of dependent claims 7, 8,
and 10 over Ulmer and Goldwasser.

   5. *Claim 13*

Regarding the recitation in dependent claim 13 of "a timer circuit
adapted to enable the preprogrammed unattended initiation of recording,"
Petitioner asserts that Goldwasser discloses such a timer circuit.  Pet. 27, 56–
57.  Relying on the testimony of Dr. Hemami, Petitioner argues that a person
of ordinary skill in the art would have had reason to modify Ulmer's system
to include Goldwasser's timer circuit "to provide the benefit of delayed
recording," asserting that "[t]his was a common and important feature of
VCRs in 1992, and users would simply demand such functionality if it were
not already provided."  *Id.* at 27 (citing Ex. 1013 ¶ 53).  Patent Owner makes
no additional argument as to the patentability of this dependent claim.  PO
Resp. 49.  We have reviewed Petitioner's argument and evidence, and we
find them to be sufficient to establish the unpatentability of claim 13.  Thus,
we adopt Petitioner's analysis of this claim and find that Petitioner's
assertions and evidence establish by a preponderance of the evidence the
unpatentability of dependent claim 13 over Ulmer and Goldwasser.

   6. *Claim 14*

Patent Owner contends that its arguments regarding claim 1 also apply
to claim 14.  PO Resp. 47.  For reasons discussed above, we do not find
those arguments to be persuasive.  Patent Owner also argues that Petitioner
did not put forth sufficient evidence to show that one would use Ulmer's
device to perform the steps of claim 14.  *Id.*  We disagree and find that

19

IPR2014-01252
Patent 5,930,444

Petitioner's analysis of claim 14 is sufficient to establish the unpatentability of this claim.

Petitioner's arguments and evidence as to claim 14 may be summarized as follows. Petitioner asserts that the limitations of claim 14 are nearly identical to those of independent claim 1. Pet. 57; *see also* PO Resp. 47 (noting that "[t]he method of Claim 14 includes providing a device substantially according to the invention of Claim 1"). Petitioner notes that claim 14 differs from claim 1 because claim 14 includes the language "begin playback of the stored program information by initiating retrieval of the program information stored in said memory unit from the beginning thereof." Pet. 57. Petitioner states that "[t]his limitation basically requires starting playback from the beginning of the recording." *Id.* Petitioner cites Ulmer's disclosure that "[f]or reading, the RAR is initialized: - to zero if image reproduction is to start at the beginning of the memory" (Ex. 1018, 4) as teaching playback from the beginning of the recording. *Id.*

Petitioner also notes that claim 14 recites "actuating said record key upon the beginning of the interruption to initiate storage of the broadcast program information in said memory unit" and "actuating said playback key upon the conclusion of the interruption to initiate retrieval and display of the program information stored in said memory unit from the beginning thereof, while continuing to store the broadcast program information." *Id.* at 57–58. Petitioner refers to these portions of claim 14 as the "actuating elements." *Id.*

Petitioner asserts that a person of ordinary skill in the art would understand that the actuating elements necessarily are present in Ulmer. *Id.* at 58 (citing Ex. 1013 ¶ 56). Petitioner notes that Ulmer describes an

20

IPR2014-01252
Patent 5,930,444

example of a person starting to record a program and later starting to watch the program, in order that the person may fast forward through commercial breaks. *Id.* Given this, Petitioner reasons that a person of ordinary skill in the art would recognize that Ulmer's delayed playback feature would lend itself to use during an interruption, and that users naturally would operate the device in this manner. *Id.*

Additionally, Petitioner notes that Goldwasser expressly teaches using its apparatus in the manner recited in the actuating elements of claim 14. *Id.* Petitioner further argues that the overlap between Goldwasser's and Ulmer's recorders provides strong evidence that users and those of skill in the art would use Ulmer's apparatus for the same purpose, asserting that common sense requires the same result. *Id.* at 58–59 (citing Ex. 1013 ¶¶ 55–57).

As such, we adopt Petitioner's analysis of claim 14 and find that Petitioner's assertions and evidence demonstrate by a preponderance of the evidence that of independent claim 14 is unpatentable over Ulmer and Goldwasser.

## III. CONCLUSION

Based on the arguments in the Petition, as well as the evidence of record, we determine that Petitioner has demonstrated by a preponderance of the evidence the unpatentability of claims 1, 2, 7, 8, 10, 13, and 14 of the '444 patent.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 7, 8, 10, 13, and 14 of the '444 patent are held unpatentable;

IPR2014-01252
Patent 5,930,444

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Certain materials have been sealed in this proceeding, but have not been relied upon in this Decision.  *See* Paper 40. The record will be maintained undisturbed pending the outcome of any appeal taken from this Decision.  At the conclusion of any appeal proceeding, or if no appeal is taken, the materials will be made public.  *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,760-61 (Aug. 14, 2012).  Further, either party may file a motion to expunge the sealed materials from the record pursuant to 37 C.F.R. § 42.56.  Any such motion will be decided after the conclusion of any appeal proceeding or the expiration of the time period for appealing.

22

IPR2014-01252
Patent 5,930,444

PETITIONER:

Michael L. Kiklis
Scott McKeown
Katherine D. Cappaert
Oblon Spivak
1940 Duke Street
Alexandria, VA 22314
cpdocketkiklis@oblon.com
cpdocketmckeown@oblon.com
cpdocketcappaert@oblon.com

Jonathan Stroud
Unified Patents Inc.
171 Main St. #106, Los Altos, CA, 94022
jonathan@unifiedpatents.com

PATENT OWNER:

Kai Zhu
60 Cody Ln
Los Altos, CA 94022
kz@dragonipllc.com

Timothy Devlin
Devlin Law Firm LLC
1306 N. Broom Street, Suite 1
Wilmington, DE 19806
tdevlin@devlinlawfirm.com

23

US005930444A

# United States Patent [19]

## Camhi et al.

[11] **Patent Number:** 5,930,444

[45] **Date of Patent:** Jul. 27, 1999

[54] **SIMULTANEOUS RECORDING AND PLAYBACK APPARATUS**

[76] Inventors: **Elie Camhi**, 131 Counry Ridge Rd., Scarsdale, N.Y. 10583; **Lawrence S. Kamhi**, 30 Saddle View Ct., Fairfield, Conn. 06430

[21] Appl. No.: **08/234,727**

[22] Filed: **Apr. 28, 1994**

### Related U.S. Application Data

[63] Continuation of application No. 07/872,435, Apr. 23, 1992, abandoned.

[51] Int. Cl.⁶ ................................................ **H04N 5/76**

[52] U.S. Cl. ................................................ **386/46**; 386/125

[58] Field of Search ................................ 358/335, 342, 358/341, 343; 360/33.1, 14.1, 13, 36.1, 27; 369/32, 54; 348/734; 386/46, 125, 126, 92, 68; H04N 5/76

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 4,488,179 | 12/1984 | Kruger et al. | 348/734 |
| 4,626,847 | 12/1986 | Zato | 348/734 |
| 4,706,121 | 11/1987 | Young | 358/142 |
| 4,856,081 | 8/1989 | Smith | 348/734 |
| 4,908,713 | 3/1990 | Levine | 358/335 |
| 5,134,499 | 7/1992 | Sata et al. | 358/335 |
| 5,170,388 | 12/1992 | Endoh | 386/104 |
| 5,172,111 | 12/1992 | Olivio, Jr. | 360/27 |
| 5,181,114 | 1/1993 | Richards et al. | 358/310 |
| 5,257,142 | 10/1993 | Hong | 358/335 |

*Primary Examiner*—Thai Tran
*Assistant Examiner*—Huy Nguyen
*Attorney, Agent, or Firm*—Natter & Natter

[57] **ABSTRACT**

A keyboard equipped audiovisial recording and playback device is provided having an input and an output adapted for connection between a users signal source and display device, respectively, and a memory unit with a storage medium enabling random access to programming information stored therein. A keyboard responsive control circuit enables manipulation and transfer of programming information between the input, output and memory. Because of the relative high speed of the control circuitry and memory access, substantially simultaneous recording and playback of television type signals is achieved, thus enabling user controlled programming delay.

**14 Claims, 5 Drawing Sheets**



Unified Patents Exhibit 1001, p. 1

*Fig. 1*



*Fig. 4*



Unified Patents Exhibit 1001, p. 2



*Fig. 2*

Unified Patents Exhibit 1001, p. 3



*Fig. 3*

*Fig. 5*

Unified Patents Exhibit 1001, p. 4

*Fig. 6*



*Fig. 8*

Unified Patents Exhibit 1001, p. 5



*Fig. 7*

*Fig. 9*

Unified Patents Exhibit 1001, p. 6

5,930,444

1

# SIMULTANEOUS RECORDING AND PLAYBACK APPARATUS

## CROSS REFERENCE TO RELATED APPLICATION

This application is a Continuation of applicant's application Ser. No. 07/872,435 filed Apr. 23, 1992, now abandoned.

## FIELD OF THE INVENTION

The present invention relates to information and entertainment systems, and more particularly, to a keyboard and memory equipped interface apparatus for the storage and processing of signals associated with such information and entertainment systems.

## BACKGROUND OF THE INVENTION

Audio and audiovisual type information and entertainment systems have become well known in recent years. These systems include not only well known broadcast radio and television media, but a plethora of systems and accessories that are intended to enhance and expand the use of television media, such as recorders, cable television networks, pay per view custom programming systems, and addressable receivers. Audiovisual recorders, commonly known as video cassette recorders, (VCR's) have become perhaps the most commonplace addition to all of these systems, enabling greater user control of the received audio and video programming.

VCR's are helpful for the storage of broadcast information so that it will not be missed by a user who is unavailable for its reception, by enabling the selective recording, often unattended, of audio and video information on a reel to reel style magnetic tape housed within a casesette. Furthermore, the features of many VCR's include control variations which aesthetically enhance the stored information during playback. While the programmability and enhanced features of many VCR's allow great user flexibility in the playback of recorded information, the construction of these reel to reel recorders and their media limit the flexibility of their usage in the accumulation of information to situations where an entire desired program of information or the terminal portion thereof is to be recorded because the user is absent or indisposed.

Frequently, programming is missed by the user due to interruptions of a more temporary nature, such as telephone calls, ringing doorbells, bathroom trips, etc.

While VCR's, as they are presently known, can be used to capture the missed programming segment under these circumstances of interruptions having a duration of less than the entire terminal portion of the desired programming, the user typically wishes to resume watching the programming immediately upon conclusion of the temporary interruption. In such a situation, the user will watch the recorded interrupted portion of the programming after having watched the end of the programming. This results in a substantial loss of continuity in so far as there may have been a significant event during the interrupted portion, thus making the post interruption segment difficult to understand or appreciate due to its reliance upon the information during the interrupted segment. This kind of situation is likely to occur in the case where the desired programming is a movie, or more so in the case of educational programming, where earlier presented information provides a foundation for the understanding of later presented information. Conversely, the

2

opposite is also possible, where after having seen the end of the desired programming, the recorded interrupted intermediate segment suffers such diminution in value so as to be of little or no value for watching, thus making the recording thereof gratuitous.

Alternatively, the user is faced with recording the entire terminal portion of the desired programming so that upon completion of recording, the user may then resume watching the programming from the point at which the programming was interrupted. In this sort of situation, the user may end up waiting idly for completion of terminal segment recording. This can be undesirable, especially if the interruption occurs at an early point during the desired programming, and where the desired programming is lengthy.

Furthermore, another deficiency associated with prior art recorders and VCR's relates to the linear nature of access to information stored on the reel to reel media employed by these devices. Very often VCR users wish to watch programming stored at one location on the media while at the same time storing new programming information at a different location on the same media. Even though the rate at which modern electronic circuits and microprocessors is sufficiently fast to process both the storage of information from one received program and retrieval of stored program information so as to be effectively simultaneous from the user's perspective, because the magnetic heads can only access the small portion of media between the reels, and because the overwhelming majority of the storage media is wound onto the reels at any given moment, it is virtually impossible to access the media for information storage and retrieval at more than one location in substantially simultaneous fashion.

Consequently, a need exists for an improved recorder for audio or video signals or both.

## OBJECTS AND ADVANTAGES

It is therefore an object of the present invention to provide an audio video recorder and play back apparatus having structure which enables the user to accommodate an interruption having lesser duration than the terminal portion of the desired programming, while minimizing the impact of the interruption on the viewer.

It is another object of the present invention to provide a recorder and play back apparatus for audio or audiovisual signals which is adapted to record and play substantially simultaneously.

Yet another object of the present invention is to provide a recorder and play back apparatus for audio or audiovisual signals adapted to enable random access to the storage media in a non linear manner.

Still another object of the present invention to provide a recorder and play back apparatus for audio or audiovisual signals which enables a user who is temporarily interrupted to resume reviewing the desired programming from the point of interruption immediately upon conclusion of the interruption.

It is a further object of the present invention to provide an audiovisual recorder and play back apparatus which enables a viewer who is temporarily interrupted to resume watching the desired programming so that the portion of desired programming beginning at the point of interruption can be viewed in proper sequence to the end, with the resumed viewing beginning at the time of conclusion of the interruption.

Yet another object of the present invention is to provide an audiovisual recorder and play back apparatus which is

Unified Patents Exhibit 1001, p. 7

5,930,444

3

adapted to accept input signals carrying programming information for storage or retransmission or both in a plurality of formats, or from a plurality of sources.

Other objects and advantages of the present invention will become obvious to those of skill in the art upon contemplation of the disclosure herein in conjunction with the drawings.

## SUMMARY OF THE INVENTION

According to the instant invention, a keyboard equipped recorder is provided which achieves the aforementioned objectives. A key element of the apparatus is memory storage media which has structure adapted to enable substantially random access to information storage locations of the media. The apparatus has at least one input and at least one output so that it may be interposed between the user's signal source and display device. The apparatus further has a user operated keyboard and control circuitry responsively coupled thereto for user selective initiation and termination of recording, as well as buffering type simultaneous recording and playback.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, wherein the same numbers are used to designate the same elements throughout the several views:

FIG. 1 is a block diagram of a first embodiment of the audiovisual recorder of the instant invention;

FIG. 2 is a block diagram of a second embodiment of the audiovisual recorder of the instant invention;

FIG. 3 is a block diagram of a third embodiment of the audiovisual recorder of the instant invention as contemplated for use with a remote control keyboard;

FIG. 4 is an diagrammatic representation of a remote control keyboard as contemplated for use in conjunction with the audiovisual recorder of FIG. 3; and

FIG. 5 is a diagrammatic representation of an enhanced function remote control keyboard as contemplated for use in conjunction with the audiovisual recorder of FIG. 3.

FIG. 6 is a block diagram of a programmable timer equipped variation of the instant invention.

FIG. 7 is a block diagram of an embodiment of the present invention having multiple programmable input channels.

FIG. 8 is a block diagram of yet another embodiment of the present invention, having singular input and output channels.

FIG. 9 is a block diagram of a filter equipped embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Turning now to the drawing of FIG. 1, a basic block diagram of the audiovisual recorder of the instant invention is shown, indicated generally by the numeral 10. While the device will be referred to herein as a recorder, it should be kept in mind that the device necessarily performs as a playback unit as well for the stored information accumulated during the recording function of the instant invention. A key element of recorder 10 is memory unit 12, which is responsively coupled to control circuit 14 for the selective storage or retrieval of information or both, to and from memory unit 12 as the case may be. Control circuit 12 is in turn responsively coupled to keyboard 16 which has at least one record key 18, and at least one playback key 20, for user control of the instant invention.

4

Memory unit 12 includes storage media having structure adapted to enable substantially immediate access to stored information at any point thereon. The storage media contemplated for memory unit 12 would include solid state memory, magnetic disk, or read/write optical disk, but not reel to reel magnetic tape as used by heretofore known video recorders, due to the aforementioned linear nature of media access dictated by the structure of the reel to reel media.

Each of the aforementioned media contemplated has distinct advantages and disadvantages when compared to the others. Solid state memory, offering speed as its primary advantage, would provide the best performance when applied to the present invention, however, at the present time such memory is relatively expensive, with pricing beginning at about $40 per megabyte (70 ns). Read/write optical disks offer the advantage of gigabyte range storage capacity, but their availability is limited and their cost high because industry standardization is still in the negotiation stages, although price and availability are expected to improve in the near future. Magnetic disk media, while not offering the speed of solid state nor the capacity of optical disks, have made dramatic improvements recently in terms of speed, capacity, and most notably, price, current pricing being about $400 for 180 megabyte units (19 ms). Another advantage of the optical and magnetic disk media is their structural adaptability for easy removal and replacement in the host recorder, thus approximating the removable feature of cassettes of presently known VCR's. Such removable cassette type media structure can also be achieved with solid state memory by the use of non volatile ram, or alternatively, low power memory such as CMOS in conjunction with a battery or capacitor or similar power source to maintain stored information, albeit at even higher cost than previously mentioned.

Recorder 10 also has one or more information inputs, 22, adapted to be connected to the user's information source, and one or more information outputs, 24, adapted to be coupled to the user's display devices such as television sets or video monitors and audio systems. Inputs 22a and 22v, as shown, are intended for connection to raw audio and video signal types, respectively, where such is the nature of the user's information sources. These inputs are coupled to memory unit 12, and the audio and video signals are stored therein upon user actuation of record key 18. Input 22m is adapted to be coupled to an information source where the audio and video signals are modulated onto a carrier frequency, such as is the case in conventional television signals received via antenna or cable TV type information sources. Accordingly, input 22m is first coupled to tuner 26 which converts the modulated signal into raw audio and video signals, whereupon the audio and video signals are then coupled to memory unit 12 and stored therein upon user actuation of record key 18. Ideally, tuner 26 is like the tuner of a radio, television or VCR, enabling the user to select one from a number of carrier frequencies for demodulation. Thus keyboard 16 is equipped with channel up key 28 and channel down key 30, coupled to tuner 26 via control circuit 14 to achieve this channel selection function.

Upon user actuation of playback key 20, information stored in memory unit 12 is retrieved and coupled to outputs 24a and 24v, as audio and video signals, respectively. Outputs 24a and 24v, as shown, provide for user connection of raw audio and video signal types, respectively, to the user's display devices where those devices are adapted for input signals in such a format, such as video monitors or audio systems, or even VCR's. Modulator 32 is connected to the audio and video signals retrieved from memory unit 12,

Unified Patents Exhibit 1001, p. 8

5,930,444

| 5 | 6 |

and remodulates these signals onto a carrier frequency, and couples this signal to output 24m for instances where the user's display device is a television, which requires a modulated input signal.

Each input 22a, 22v, and 22m is coupled to a corresponding output 24a, 24v, and 24m, respectively, by a bypass line 34a, 34v, and 34m. Furthermore, each bypass line has a serially oriented bypass switch 36a, 36v, and 36m, each switch being coupled responsively to control circuit 14, which is adapted to selectively open the circuit between those corresponding inputs and outputs during playback operation of recorder 10. Thus upon user actuation of the play key 20 of keyboard 16, the coupling of signals between the inputs 22 and their corresponding outputs 24, via bypass lines 34, is disabled by switches 36, which assume the states shown in FIGS. 1 through 3. This insures that information present on the inputs 22 is prevented from interfering with the information retrieved from memory unit 12 and coupled to outputs 24.

Basic operation of the instant invention begins with the user watching or listening to desired programming, and recorder 10 off. Then comes a temporary information such as a telephone call, whereupon the user actuates record key 18. Control circuit 14 initiates storing information present on input 22 in a recording within memory unit 12. Upon conclusion of the telephone call, the user actuates playback key 20, and control circuit 14 initiates sequential retrieval from memory unit 12 of the stored information from the beginning of the recording, while storage of information present at the input 22 continues substantially simultaneously. The user resumes the desired programming from the point at which the interruption occurred, the desired programming information being presented to the user with a time delay effect, the time delay being the length of the interruption so that the user has missed no information as a result of the interruption.

Turning now to FIG. 2, a block diagram of a second embodiment of the instant invention is shown, having a data compression circuit, 38, interposed between inputs 22 and memory unit 12. A plethora of data compression algorithms exists today, and the number grows daily with increasing efficiency related to development of those algorithms and hardware developed for their implementation. Indeed, compression rates of 90% and more have been achieved, although the efficiency of such systems depends upon the format and content of the information to be stored. Compression is performed upon the information present on inputs 22 before the information is passed to memory for storage. Since the compressed stored information is no longer in its original format, it must again be processed before it can be transmitted to the output 24. Accordingly, the embodiment of FIG. 2 also includes a data decompression circuit 40 interposed between memory unit 12 and outputs 24.

As mentioned above, recent advances in the field of data compression have resulted in greater degrees of size reduction for stored programs, and that such compression is achieved at throughput rates higher than ever before due to improved hardware and software, the fact remains that data compression and decompression still takes time. This decompression necessarily affects the rate at which information retrieved from memory unit 12 can be transferred to outputs 24. On the other hand, since the application of data compression techniques can reduce the memory necessary to store information, the impact of high cost per unit of solid state memory can be substantially reduced, thus adding to the commercial practicality of application of otherwise

expensive solid state memory to memory unit 12. When this is considered in light of the fact that solid state memory offers data access time more than a million times faster than that of more affordable magnetic disk media, the additional time necessary for retrieval, decompression and output becomes insignificant as compared to alternative media.

Turning now to FIGS. 3 and 4, a further embodiment of the instant invention is shown. Therein, receiver 42 and transmitter 44 are interposed between control circuit 14 and keyboard 16 for communication therebetween so as to enable keyboard 16 to be placed within a discrete remote control housing 46. Although a wide variety of remote control systems may be applied to the present invention without departure from the spirit or scope thereof, the preferred arrangement applies infra red light emitting diode 48 to transmitter 44 and infra red photo detector 50 to receiver 42 to achieve wireless communication between the two.

It should be noted that the power source contemplated for remote control unit 46 is batteries, as opposed to AC power source contemplated for recorder 10, however alternative power sources may be applied to the instant invention without departure from the spirit or scope thereof.

Turning now to FIG. 5, a more elaborate variation of remote control unit 46 is shown, much like the remote control of FIG. 4, is contemplated for use in conjunction with a receiver equipped recorder as shown in FIG. 3. The enhanced remote control has additional function keys intended for use during time delay playback by recorder 10, as described above and initiated by user actuation of playback key 20. These additional function keys include fast forward 52 and reverse 54, pause 56, and frame advance 58. Control circuit 14 is adapted to respond to user actuation of these keys by controlling the rate and sequence with which stored information retrieved from memory unit 12 is transferred to outputs 24 for display. This enables the recorder of the instant invention to approximate the enhanced playback features which have become well known from their presence on all but the least expensive VCR's presently known and marketed. It should be noted that control circuit 14 is adapted to respond to the forward and reverse keys in momentary fashion, implementing the appropriate rate and sequence of transfer of information from memory 12 to output 24 only while actuation of those keys is maintained. This is unlike the on and off toggling type function performance control circuit 14 is intended to execute in response to actuation of record key 18, playback key 20, and pause key 56.

The operation of frame advance key 58, which is used in conjunction with the pause function, is contemplated to advance one frame each time the key is actuated by the user, although ideally, maintained actuation of the frame advance key for more than a period of one or two seconds would result in the successive advance of stored frames in slow motion stop action fashion.

An additional use is contemplated for pause key 56 and frame advance key 58, which enables the user to check for the presence of subliminal or other unwanted information included within the stored programming. This function is achieved by initiating playback of the stored programming information, and the using pause key 56 in conjunction with frame advance key 58 to individually step through and review each of the frames within the stored program or a portion thereof.

Also shown on the keyboard of the remote control of FIG. 5 is terminate key 60, the actuation of which is responded to

Unified Patents Exhibit 1001, p. 9

5,930,444

7

8

by control circuit **14** by cessation of storage of information present on input **22** and ending the storage of program information, but continuing the sequential play back of the stored information until the end of the stored program segment is reached. When the end of the stored program segment is reached, play back of the stored information is stopped, and recorder **10** reverts to a passive state, with information present at input **22** being coupled directly to output **24**.

In FIG. **6**, another embodiment of the instant invention is shown, having programmable timer **62**, to which control circuit **14** is responsively coupled for unattended beginning and ending of the recording function. So equipped, the instant invention may be used in circumstances where the user may not be available for manual execution of these functions. For example, if the user anticipates the possibility that there may be some delay in arriving in time for the beginning of desired programming, recording may be initiated by timer **62** after appropriate setting by the user. Timer **62** may also be applied to unattendedly cease the recording at a preselected time, and thereby conserve memory, for example in instances where the interruption or delayed arrival could possibly extend beyond the end of the desired programming.

There are also occasions where it may be desirable to record audio in conjunction with video where the signals have differing origins. Perhaps the most common example of such an application is the 'simulcast', where a concert gets video coverage on a television channel, while a radio station broadcasts high(er) fidelity audio coverage of the concert. Another such application includes sporting or news events which are broadcast on a television channel, while the same event is being covered by a radio station having an announcer preferable to the user. Accordingly, FIG. **7** shows yet another embodiment of the present invention having multiple programmable input switches **64**, which allow for connection and coupling of inputs **22** to a plurality of signal sources, so as to enable the selection and recording of audio and video signals of differing origins. Should a user wish to record the separate audio and video coverages of the same event, the switches coupled to the desired signal sources would be closed. Switches **64** may be of the type requiring manual actuation, but could also be of the automatic programming type, which would add to the complexity and cost of the unit. In either arrangement, audio frame AM, FM, shortwave, or other origins may be selected, and likewise, video signals from broadcast, cable, microwave or other varying origins may also be selected.

Turning now to FIG. **8**, the most basic block diagram of the instant invention is shown, having a singular input **22** and output **24**, which would enable the simultaneous buffering type recording and time delay play back of an audio only input signal. Such an embodiment of the instant invention would be useful for a visually impaired person or for instances where the desired programming information is audio only.

Furthermore, if the sample rate, speed and capacity of memory unit **12** is sufficiently high, the singular input **22** of FIG. **8** may be coupled to an antenna or cable TV source, and singular output **24** coupled to a television, VCR, or other tuner equipped device, thereby enabling the recording of a multiplicity of channels of programming information together, for separation and channel selection via the external tuner equipped device during playback.

Hardware may also be added to the instant invention to implement automatic checking for subliminal or otherwise unwanted or unsolicited transmissions, as illustrated in FIG. **9**. Therein, filter **66** is interposed between memory unit **12** and output **24**, and is programmed to screen information retrieved from memory according to a predetermined pattern. One example of such a pattern which would typify subliminal information would be two sequential substantially similar frames of information which are bordered by a multiplicity of frames of information, the bordering frames being substantially similar to each other, while differing substantially from the bordered frames. Such a pattern would indicate the transmission includes information brief enough to escape conscious detection by the user, although of sufficient duration to be detected sub consciously. Upon detecting information meeting the predetermined parameters of filter **66**, a variety of scenarios may then be implemented, the simplest of which is merely refraining from outputting the suspect information to output **24**. Alternatively or in addition, filter **66** may illuminate a lamp or actuate some other indicator, such as an audible alert or an on screen display, to call the user's attention to the presence of such information, whereupon the user may then act accordingly.

While the above specification contains many specificities, these should not be construed as limitations on the scope of the instant invention, but rather as an exemplification of the preferred embodiments thereof. Accordingly, the scope of the instant invention should not be determined by the embodiments shown, but rather by the claims appended hereto and their legal equivalents.

What is claimed is:

**1**. A recording and playback apparatus for the substantially immediate and seamless resumption of interrupted perception of program information based upon audio or video signals, or both, without missing the program information presented during the interruption, comprising:

means for powering the apparatus;

a keyboard having a record key and a playback key;

a control circuit coupled responsively to said keyboard;

a memory unit coupled responsively to said control circuit, said memory unit having a medium for storage of information, said storage medium having structure which enables substantially random access to information stored in said medium for retrieval of the stored information from said storage medium;

at least one input, said input being connected to a user's audio/video program signal source and also being coupled to said memory unit so as to enable program information presented by the signal source to be transferred to and stored in said memory unit; and

at least one output, said output being connected to a user's audio or video display device or both, said output further being connected to said memory unit so as to enable the transfer of program information from said memory unit to the user's display device, said control circuit being configured so that substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to begin a recording by initiating storage of the broadcast program information in said memory unit, and said playback key is subsequently and solely actuated to begin time delay playback of the recording from the beginning thereof by initiating retrieval of the stored program information in said memory unit, with the interval of the time delay being the same as the time elapsed between the actuation of said record key and the subsequent actuation of said playback key.

**2**. The apparatus as set forth in claim **1**, further comprising a remote control unit, and wherein said keyboard is housed in said remote control unit.

Unified Patents Exhibit 1001, p. 10

5,930,444

9

**3**. The apparatus as set forth in claim **2**, further comprising means for wireless communication between said remote control unit and said control circuit.

**4**. The apparatus as set forth in claim **3**, wherein said means for wireless communication is infra red.

**5**. The apparatus as set forth in claim **1**, wherein said storage medium is removable from the apparatus by the user.

**6**. The apparatus as set forth in claim **5**, wherein said storage medium comprises magnetic or optical disk memory.

**7**. The apparatus as set forth in claim **1**, wherein said storage medium comprises solid state random access memory.

**8**. The apparatus as set forth in claim **1**, wherein said keyboard further includes key means for enabling user control of the rate or sequence or both of transfer of program information from said memory unit to the user's display device, and such variation of rate or sequence results in a corresponding variation of the interval of the time delay.

**9**. The apparatus as set forth in claim **8**, said control circuit being further configured to automatically discontinue both recording and playback functions, and resume normal real time display of broadcast program information when said key means for controlling the sequence and rate is subsequently used to advance the playback of stored information to a point where the interval of the time delay becomes negligable.

**10**. The apparatus as set forth in claim **8**, wherein said key means includes a frame advance key for advancing the transfer of program information to the user's display device at a rate sufficiently slowly so that a user may review the content of the program information transferred from said memory unit on a frame by frame basis.

**11**. The apparatus as set forth in claim **1**, further having at least one additional input, and all said inputs have programmable switches oriented serially therein so that said inputs may be coupled to a plurality of signal sources, and means for user setting of said programmable switches in which at least one of said plurality of signal sources is selected.

**12**. The apparatus as set forth in claim **1**, further including a filter interposed between said memory unit and said output, said filter being for detecting covert program information according to one or more predetermined patterns, said predetermined patterns being indicative of unsolicited or otherwise unauthorized information within the stored program information.

10

**13**. The apparatus as set forth in claim **1**, further comprising a timer circuit adapted to enable the pre programmed unattended initiation of recording.

**14**. A method for enabling the substantially immediate resumption of perception of broadcast program information after an interruption thereof without missing the program information presented during the interruption, comprising the steps of:

providing a recording and playback apparatus having a keyboard having a record key and a playback key; a control circuit coupled responsively to said keyboard; a memory unit coupled responsively to said control circuit, said memory unit having a medium for storage of information, said storage medium having structure which enables substantially random access to information stored in said medium for retrieval of the stored information from said storage medium; at least one input, said input being connected to a user's audio/video program signal source and also being coupled to said memory unit so as to enable program information presented by the signal source to be transferred to and stored in said memory unit; at least one output, said output being connected to a user's audio or video display device or both, said output further being connected to said memory unit so as to enable the transfer of program information from said memory unit to the user's display device, said control circuit being configured so said substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to begin a recording by initiating storage of the broadcast program information in said memory unit, and said playback key is subsequently and solely actuated to begin playback of the stored program information by initiating retrieval of the program information stored in said memory unit from the beginning thereof;

actuating said record key upon the beginning of the interruption to initiate storage of the broadcast program information in said memory unit; and

actuating said playback key upon the conclusion of the interruption to initiate retrieval and display of the program information stored in said memory unit from the beginning thereof, while continuing to store the broadcast program information.

*  *  *  *  *

Unified Patents Exhibit 1001, p. 11

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 5,930,444 | Page 1 of 1 |
| APPLICATION NO. | : 08/234727 | |
| DATED | : July 27, 1999 | |
| INVENTOR(S) | : Elie Camhi and Lawrence S. Kamhi | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

At claim 14, line 28, replace "so said" with --so that--

Signed and Sealed this
Twenty-seventh Day of November, 2012

David J. Kappos
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.        : 5,930,444
APPLICATION NO.  : 08/234727
DATED           : July 27, 1999
INVENTOR(S)      : Elie Camhi and Lawrence S. Kamhi

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

At claim 14, Column 10, line 28, replace "so said" with --so that--

This certificate supersedes the Certificate of Correction issued November 27, 2012.

Signed and Sealed this
Eighth Day of January, 2013

David J. Kappos
*Director of the United States Patent and Trademark Office*

Unified Patents Exhibit 1001, p. 13

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.         : 5,930,444                                  Page 1 of 1
APPLICATION NO.  : 08/234727
DATED              : July 27, 1999
INVENTOR(S)       : Elie Camhi and Lawrence S. Kamhi

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

At claim 1, column 8, line 32, replace "perception of program information" with
--perception of broadcast program information--

Signed and Sealed this
Fifth Day of March, 2013

*Teresa Stanek Rea*

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

Unified Patents Exhibit 1001, p. 14

(12) **SUPPLEMENTAL EXAMINATION CERTIFICATE**

**United States Patent**                    (10) **Number:**    **US 5,930,444 F1**

**Camhi et al.**                            (45)  **Certificate Issued:**    **May 9, 2013**

**Control No.:  96/000,013**                **Filing Date:  Mar. 11, 2013**
**Primary Examiner: Hetul Patel**

No substantial new question of patentability is raised in the request for supplemental examination. See the Reasons for Substantial New Question of Patentability Determination in the file of this proceeding.

**(56)  Items of Information**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,856,081 | 08-08-1989 | Smith |
| 5,134,499 | 07-28-1992 | Sata et al. |
| 5,241,428 | 08-31-1993 | Goldwasser et al. |

#### OTHER DOCUMENTS

Paper No. 25 of the Prosecution History of the US 5,930,444 patent (Amendment D submitted to the Patent Office on July 22, 1996).

Paper No. 26 of the Prosecution History of the US 5,930,444 patent (Office Action dated November 27, 1996).

Paper No. 27 of the Prosecution History of the US 5,930,444 patent (Examiner Interview Summary dated January 15, 1997 and mailed on April 30, 1997).

Paper No. 28 of the Prosecution History of the US 5,930,444 patent (Interview Summary dated April 30, 1997).

Paper No. 30 of the Prosecution History of the US 5,930,444 patent (Supplemental Amendment E submitted to the Patent Office on October 29, 1997).

Paper No. 34 of the Prosecution History of the US 5,930,444 patent (Notice of Allowance dated February 1, 1999).

Unified Patents Exhibit 1001, p. 15

**PROOF OF SERVICE**

I, Lei Mei, hereby certify that on July 21, 2016, a copy of the foregoing **BRIEF FOR APPELLANT** was served via the ECF Filing System on all counsel of record.

Upon acceptance by the Court of the e-filed document, six paper copies of the brief will be submitted to the Court, via hand delivery, within the time provided in the Court's rules.

/s/ Lei Mei
Lei Mei